on behalf of Mr. Solorio-Gonzalez. I think that Mr. Solorio-Gonzalez's case demonstrates the immense power that the government has over somebody who's arrested over a defendant. Could you bring that a little closer because I'm having trouble hearing. Thank you so much. I can speak up louder. Thank you. Sorry. I think that this case demonstrates the immense power that the government has over a defendant and that the balance of power is always tipped against the defendant and for the government. From the date that he was arrested, the government had an extreme bargaining position over him, not only at the arrest when they interviewed the material witness and they interviewed Mr. Solorio, but at the plea bargaining stage where the government twice offered him a plea bargain and then pulled it before trial and then we had to go to trial. And then at trial, when he made a motion to not allow the government to admit the testimony of the material witness or the statement that he himself made to the government denied it, Crawford was decided immediately after the trial and before sentencing. Mr. Solorio made a motion for the Court to reconsider a new trial based on that, and he was denied that opportunity. I mean, isn't the problem that you need to win on both points for either one to matter? In other words, you have his confession and you have the material witness, and unless they're both out, one is sufficient and you have a prejudice problem. Right. But there is also the issue with regard to the confession, that it was involuntary and that it was beyond the safe harbor rule. I understand that, but all I'm pointing out at the outset is you have to win on both points for either one to matter. That the statement should be – that the confession should have been suppressed and that the material witness should have been allowed. Well, there was a confession. There was a confession in this case, but as I pointed out, there were some circumstances regarding the confession that I think led to an involuntary confession. It was beyond the safe harbor rule. He was arrested on the 7th. He wasn't taken to court until three days later. And there was a lot of time for machinations by the government. Is there any dispute about the timing of this? The interrogation started, what was it, seven or so the next morning? Yes. And his confession came very promptly, didn't it? About five hours later, yes. It was pretty prompt. But they had his wife in custody. They had his wife in custody. They had his brother in custody. And he was told that if he did not speak and make a statement, that both his brother and his wife would be prosecuted. Is that what the district court found as a matter of fact, or did it find different facts? The court – the agent testified that that wasn't true. My client did submit an affidavit. The court accepted the agent's testimony? The court accepted the agent's testimony. Aren't those the facts, therefore, in this case, as far as we're concerned? Yes. Okay. In terms of the material witness statement, the agent actually testified about what the material said at his interrogation. The material witness, just like a defendant, is arrested and detained and interrogated. And in this case, he was interrogated for two reasons. One, to prove that, well, he himself was committing a crime of illegal entry. And two, that he was being smuggled into the country by Mr. Solorio, that he was a citizen of Mexico, and that he was paying someone to bring him into the United States. Is there any doubt that if Solorio's own confession is regarded as properly admitted, that he said basically the same thing? Pardon? That Solorio – Mr. Solorio said basically the same thing in his confession. Is there anything that you would – that is missing in terms of an element of the crime if Solorio's confession is – I think that Mr. Solorio – yes, I mean, Mr. Solorio admitted that he was bringing this person, but I don't think that he admitted that he was an undocumented person from Mexico. I don't believe that Mr. Solorio said he was a citizen of Mexico, and Mr. Solorio didn't have the personal knowledge. I believe that he said that he did bring this person across the border, but he didn't testify about his citizenship status, no. I think the problem with this whole case is that – also, is that Mr. Solorio, you know, after he said he recognized that he was bringing this person across the border, attempted to try to resolve this case several times. And even on appeal – on the appellate level, you will note that there were several continuances because we were trying to resolve this case. And unfortunately, Mr. O'Toole, who was bargaining this case with me, left their office before we could resolve the case because I think he recognized that his office was in the wrong when they offered him a plea bargain two different times by two different U.S. – by two different assistant U.S. attorneys, and then they renewed. Kagan. Let me go back to the question I asked you earlier. The – there's testimony with regard to his confession, is that he stated that he came in contact with a gentleman by the name of Sergio. Sergio offered him money to bring a friend across the border. The friend of his didn't have any papers. And why isn't that – why didn't he have any papers? That's not good enough to demonstrate that he didn't belong in the United States? I don't think that – I don't think that that is strong enough to demonstrate that he was an alien. You have to prove that he was an alien. You couldn't infer that he was an alien from the fact that he was on top of – he was stuck in a hidden compartment and that he was – that the confession said that he didn't have any papers? I think that you can infer that he was hiding from the officials at the border. What about he didn't have any papers? Well, papers could mean a lot of different things. Papers could mean he was on parole, didn't have permission to come into the United States from a parole officer. I'll reserve the rest of my time. Good morning. May it please the Court. Mark Rahe for the United States. Your Honor, I don't think anything untoward happened in this case. All the issues were fully litigated before the district court. The findings of the district court, I believe, were appropriate in all respects. But I don't exactly know where to begin, but maybe perhaps with the issue of the confession, because I know there was a lot of discussion about that by defense counsel. In this case, first of all, I know Judge Fernandez asked, the district court expressly found that there had been no threats or coercion made. And that's the excerpt of record, page 24. What did the – was the – were the officers who were present specifically asked whether they said what Mr. Solorio said they said, or were they just asked in general whether they met any threats? To the best of my recollection, I think it was actually the first one, Your Honor, because I know that in cross-examination there was a lot of inquiry about, well, the issue of the children. Were you the first to bring that up? And I believe that Senior Inspector Armijo eventually admitted that he did bring it up, but that it was never brought up again. And I wish I knew that off the top of my head. Unfortunately, I wasn't the trial counsel here, but – Well, you know, when you come up here, you're supposed to have read the record, and it's not a very long record, so I don't think not being the trial counsel is a very good answer to the question. But I do know that this issue – a declaration was provided. The defendant made that claim. The district court – but the defendant didn't testify at the hearing. The district court never found any evidence of such coercion. Well, there was evidence. He submitted a declaration. And I'm – what I'm trying to understand is on what basis can she, without having a live witness there, testify? I don't know whether the defendant offered to testify or refused or could have testified. But assuming that he could have, what she has is a declaration when she chooses to disbelieve without having seen the defendant or allowing him to be cross-examined. And I'm – and it might be of some pertinence as to whether she had a basis to disbelieve or whether the question was asked specifically or generally. But we don't know. Well, we'll find out. You know, and I'm sure it's in there, and I don't want to, you know, rifle through too much, but I think it's in there. What bothers me is that it has a ring of authenticity to me only in the sense that it seems somewhat odd to me that the other two people, or neither of them, were arrested also, particularly the brother. And, you know, so you sort of wonder about that. And that is what makes you wonder about whether something wasn't sent in. Well, I mean, to the extent we want to indulge in inferences that weren't squarely before the Court, I don't think it's so unusual, Your Honor. I mean, the law is clear in the circuit that even being merely present at the scene of the crime and knowing about it isn't enough to show aiding and abetting. You have to have something more than mere knowledge and mere presence. In this case, I don't know that there was such evidence. But I think it's also important to keep in mind, I mean – The only piece of evidence was that the material witness apparently said that two guys came and got him, not one. True. And in most ailing, smuggling operations, there are a lot more people involved than just the defendant. But this case is about the defendant. He's the one that's charged. I think the interesting thing is here, the whole basis for his motion to suppress on appeal is the 6-hour rule, the safe harbor violation. I mean, this stuff is sort of collateral on the side as far as, well, what did he say about my kids? I read the briefs. The briefs are all about the – It wasn't about kids, as I understand it. His statement wasn't that anybody said anything about kids. It's that they said that his brother and wife wouldn't be released until he – Well, I think it was two things. Plus, he had kids, and therefore, if he didn't talk to them and they didn't release his wife or brother, who would then take care of the kids? I think that was the suggestion that is made. But then the record is absolutely silent about anything to corroborate that. The square focus of the claim on appeal is this whole 6-hour violation, the safe harbor rule. And I think in that sense, it's important to keep in mind that even under 3501, the statute itself says that timing is only one factor, that none of the factors need be conclusive. In this case – It's a very confusing statute. My understanding of our case law is that subsection C is independent, as it reads, independent. And that it is a sort of prophylactic rule, why it's connected to the time of arraignment as opposed to the time of confession. I don't have a clue, but that's how it's written. And it does seem to provide for suppression, independent of voluntariness, if it's violated. And that's how our case law has read it, as I understand it. Is that wrong? No. But you know what? It's also important to keep in mind, like in the Van Poy case, it says it can be suppressed, but suppression is not mandated. And then maybe two sentences later, this Court couldn't be any clearer when it says, you look to whether the delay was reasonable or whether public policy would be violated by admitting the statement. And that's why in this case, two or three witnesses were put in front of the district court. The district court hashed this whole issue out. I think it's also important to keep in mind that the standard of review on whether delay was reasonable is clear error. And that's a very deferential standard. That's a very high standard. In this case, all of the witnesses testified. They provided the timeline. This defendant came in at 10.40 p.m. on the night of October 7th. It's in the late night hours. There's a swing shift. We had testimony from Inspector Harrison, followed by testimony from Inspector Woodington, and then Senior Inspector Armijo. The records were, or the evidence is undisputed that five separate cases had come in the evening of the 7th, starting at 9 p.m. There were two felony warrant cases. There were two reentries by deported alien, 1326 cases. And then this case came last. And with that kind of a manpower, I believe it's interesting, too, the first inspector, his shift was actually supposed to end at midnight. I believe that was Harrison. He stayed two hours longer. All of those cases required a lot of processing. You have to interview witnesses, do record checks. And the testimony was that they take the cases in the order that they come. In this defendant's case was the last one. I don't think there was any evidence to show that this delay was purposeful. When you read this Court's cases, Gaines, Padilla-Mendoza, Van Poyt, one of the underlying themes is was the delay undertaken intentionally to give the government some sort of tactical advantage. I think you can't agree with that.  It seems to me that this is a point of the confession. It doesn't seem that it was. And one would think that that would be the dispositive question. But the way the statute's written, it kind of is. It seems to be concerned about when the arraignment ultimately occurred, and that was certainly a lot later. I suspect you're probably right, but it's a very peculiar statute. It is. It is unusual. I know this Court has even said that. But when one looks at it, there's a couple of points about it. First of all, he was arraigned within 48 hours, and that takes care of the constitutional concerns in the County of Riverside case. The other thing is the record, again, there are very few gaps here. The testimony shows that 10.40 p.m., October 7th, defendant comes into the court. 12.15, October 8th, in the morning, he's first advised of his Miranda rights, but there's not enough agents to interview. 7.15 that morning, he's re-advised of his Miranda rights by Inspector Armijo. The interview occurs. It's also important to keep in mind there are four individuals in this case, defendant, front seat passenger, back seat passenger, plus the illegal alien. All four of those people need to be interviewed before a complaint can be issued. That takes, I think, Senior Inspector Armijo testified, that took him up to 11.30 in the morning of the 8th. Then he has to do paperwork to parole the material witness in. He has to call the MCC, and again, he testified to all this as far as having a window to bring the individuals into custody. He was given a window between, I believe, 5 and 6 p.m. They were brought at 5.40 p.m. on the evening of the 7th. But Inspector Armijo also testified that his paperwork, in completion for the case, I don't believe ended until 3.15 in the afternoon, and there was undisputed testimony that it's the practice of the judges in the Southern District of California, when you want to get somebody on arraignment, there's generally two calendars. In this case, I believe the magistrate was Judge Brooks. He has a 10.30 a.m. calendar and a 2 p.m. If you want to get in on that 10.30 a.m. calendar, you have to see that magistrate, I believe, between 7 and 8 or 8 and 9 of the morning of that day. Here, if the work wasn't done until 3.15, that would have been impossible. Similarly, if you want to get in on the afternoon calendar, you have to see the judge between 12 and 1. Again, the paperwork here wasn't done until 3.15, and I believe the evidence shows that the complaint wasn't done until 8 o'clock that night. That notwithstanding, Inspector Armijo even stayed a few hours past his shift. There's no evidence that they're goofing off or just wasting time. The defendant was taken in the MCC, the detention center, as soon as practically possible within that window, and that is at 5.40 p.m. on the 8th, and the very next available appearance before magistrate, the next morning, the 9th. And that's what the evidence shows he was arraigned. But even on top of that, I think one of the things this Court has to look at, even if, you know, if by some extraordinary measures they could have arraigned him the day before, was there any prejudice to the defendant? No. Because if he gave one statement after 7.15 in the morning on the day of the 8th, no further interview was done between that time and the arraignment. Kagan. My reaction to this whole story is that if we – if he hadn't confessed earlier and this whole time had elapsed another day and a half, I'm not sure all the excuses in the world would necessarily have mattered if he confessed during that time period, given the fact, during the additional time period, since the concern, obviously, is that people kept in detention for very long are going to do things to get out that they wouldn't otherwise do. And the reason why they're in detention is because we've set up a system that moves so slowly, it may not make a difference. But here, we have this confession way before any of this happened, and that's why it's very hard to know what to do with him. I don't think it's unreasonable, Your Honor. I mean, he has to interview the other people. Do we want a system where law enforcement agents have a few parties? But judges don't have to, you know, keep the schedules they keep, and we don't have to have – and so on. If we really were concerned about this, we would – and another case we might be, but here he confessed before, you know, fairly promptly. True. But, you know, I would point out that in the State of the United States v. Gammis, this Court, and this is at 301F3rd at page 1143, found a delay beyond the safe harbor rule to be reasonable, did not exclude the confession, and specifically noted the policy of when the judges would take arraignments or not. The State of the U.S. District Court in Tucson requires advance notification by 1030 a.m. of each defendant who will be brought to that day's 2 p.m. initial appearance. This case is no different, Your Honor. Is there anything you want to say about the plea bargain? Because you don't need to take your 20 minutes. Okay. No, I understand that. The – if we agree with you on the confession, does it really make any difference how the Crawford issue comes out on the statement of the person being smuggled? I mean, perhaps not, Your Honor, because you could – this Court can either reach that and then find – you know, depending on what you find, you could find harmless error. But in this case, obviously, harmless error is a strong position here. The reason I ask, of course, is that you do have a footnote in your brief, I think, saying, well, please decide the Crawford issue because it comes up all the time. Well, true. You know, I think we did that in abundance of caution, and I thought that actually that would be the main issue we would be talking about here today, because this Court – if this Court does not find that in ailing statements about his citizenship are testimonial, this Court doesn't need to overrule Winn. Because Winn – I mean, Winn is pretty much – the facts are very similar here. But this wasn't only a statement about his citizenship. It was a statement about who – the circumstances of him coming across the border. True. But in this case – and as we point out, we are distinguishing, basically. The first thing he's asked is about his citizenship and if he has papers. At the Illuminati hearing, the government said this is the only thing that we want to introduce. Everything after that, we will concede as testimonial within Crawford. When they start asking this material witness, you know, what were the circumstances of your being apprehended, who did you contact in Tijuana, that's testimonial. But as we lay out in our brief, our position with respect to that part of the statement is that that was invited error. And I think there's a strong basis for that because, again, the prosecutor represented that the only thing we wanted to introduce was the ailing statements – I'm sorry. What was invited error? The fact that the rest of that statement came in of the material witness. Well, the only thing you're introducing is that he's an alien and he doesn't have papers. That's what we wanted. Yes. And that was the only offer that was made? Yes. And what were you going to do, redact all the rest of the statement? Well, we just – Or I guess it's not a written statement. It's just the testimony. It's a testimony. This is a – Well, our position was certainly not unreasonable. That is, if you're going to introduce something from this guy, then we – it's essentially misleading not to represent all of it. Well, but if we – in the spirit of Crawford, again, which came out after the trial, during the time of the trial, the parties proceed in accordance with the laws that was then in effect. That's a different matter. But the notion that you're entitled to represent – that you get out of Crawford by introducing a piece of a set of testimony which, under ordinary rules of evidence, they would be entitled to insist on having all of it doesn't sound right to me. In other words, I don't think you can – you eliminate by being narrow in what you want to represent – want to present ordinary rules of evidence, which have good reasons for saying that you get to see the whole of something, not just a piece of it. I don't know that I necessarily agree with all of that, Your Honor. The reason I'd say that is this. Prosecutors often look at a rule like if you introduce a prior conviction, that's what then the court can say, you know what, I find under 609 that you can do that. But then you often see prosecutors in abundance of caution sanitizing it, not going into all the details, only introducing part of it. I would say that's analogous to this. And when we talk about – I mean, the whole thing about what is testimonial within Crawford, an alien statement as to his alienage and whether he has papers says absolutely nothing about the defendant in this case. It doesn't bear witness within the meaning of Crawford. It is sort of an object of routine matter that only pertains to that defendant. I want to share a view with a harmless error question. Did the – assuming that the confession is admitted, is the confession sufficient by itself to meet the elements of the crime? I believe so. But here we have not only that confession. There are a couple other key facts. As Your Honor pointed out, you have the circumstances of the aliens of where he was found. I mean, he's found in a roof compartment that is barely big enough to hold him. And I would point out that in the case of Payne Gutierrez, this Court at 222 F. 3rd at pages 1089 to 90 also had before it an alleged confrontation clause violation based on the statements of a material witness. One of the factors that this Court found harmless error on was the circumstances in which that alien was found. And in that case, he was balled up in a spare tire compartment. And I'd read from that opinion quote. What else did Solario say? He said he didn't have papers. Right. Plus, the material witness had no documents on him. And plus, there's circumstances of the defendant's behavior at the court. He shows nervousness. His hands are shaking. His carotid artery is pulsing. And he lies. This is also important. When he's first asked for his purpose in going to Mexico, he says, I was going to take my money there. But I suppose the guy could be a murderer rather than a person without a citizen. Well, possibly. But I don't know. You know, that's maybe a possible doubt. I don't think that's a reasonable doubt in this case, Your Honor. And especially when this Court has recognized already in a case, Payne Gutierrez, that when you have somebody, and this was the quote, if the material witness had been a citizen of the United States or otherwise legally entering the country, he would not have been required to go through such contortions to cross the border. I think that same analysis applies here. But I guess with my remaining time, I will address the plea agreement issue that Your Honor alluded to earlier. In this case, it is sort of unusual what happened. And there was a pinballing between various prosecutors who had this case. I think the most important thing to keep in mind, though, is the proffer agreement that was signed. And I believe that's a supplemental excerpt to record 10 and 11. That was signed on February 11, 2003. The paragraphs, the provisions of that agreement could not have been any clearer. That there are no ---- And the pertinence of that is essentially that he wasn't relying, if there were an agreement he wasn't relying on, and then it could be withdrawn at any time before it approved. So even if we think there was an agreement, it doesn't matter. Is that basically what went on? Exactly. Because the way I see it, in a chronological order, you know, he has this offer. If you cooperate and if it's found to be substantial assistance, we're looking at a 545. But then on February 11, 2003, he signs this proffer agreement. He only meets with the government for the first time after that. On February 13th, that apparently was an unproductive session. He gets a new lawyer, April 11, 2003, suddenly there's discussions. But as the district court pointed out, that agreement cannot be ignored. It was entered into. It was signed. It specifically says that no promises are being made. And I believe in paragraph 5, it then goes on to state no agreements are enforceable unless in writing. That cannot be ignored. I notice it's not once pointed out in either the appellant's opening brief or her reply brief. That can't be ignored because that colors the reasonableness of his expectations. When he goes into that proffer session, he signed that agreement. And as the Court also pointed out, he wasn't prejudiced because he still was able to go to trial. And the agreement said that we couldn't even use that, whatever he said in the case in chief. Plus, it was cumulated to his own confession. I mean, I presume if he gave evidence about other people, he could be in danger or something. There could be other kinds of prejudice. Possibly. But again, you know, I think that's more on the realm of conjecture. Here, what do we have in front of us? We do have the signed proffer agreement. And it states in plain language that no promises are being made. I mean, that's why we have these agreements, to protect ourselves in these situations. I think under even the most generous of contract laws. It's kind of weird, though, because it's kind of counter to the truth. There were promises being made. Well, I don't know. Promises. I mean, that's how you characterize negotiations. A lot of people say, hey, we've got information for the government. So much of it doesn't pan out. We say, look, we'll listen to you. We'll give you. We'll make a good faith effort here. But there are no promises. And you know that. He signed a plea agreement at that point. Would you still have given them the same proffer? That, unfortunately, I don't know. Because, you know, one, I wasn't there. But, two, we did elicit declarations from our supervisors. The thing that's most unusual about this case, and I'm well aware of the 545 disposition, it's usually used in importation cases. I believe Mike Laster, we have a couple declarations from supervisors. In all the years they've been in the office, they have never once heard of a, you know, smuggling failure to declare cargo case being used as an alternative disposition in an alien smuggling case. And as the district court pointed out, there were even doubts whether a factual basis could have been legally possible for this case. Because failure to declare a person a person is not cargo within the meaning of 18 U.S.C. 545. And so I guess unless the court has any further questions, the government would submit. Yes, ma'am. I think that if the court just simply focuses on the safe harbor rule, you're going to find that there was no violation here. But I think that one of the things that the court should also see is that the government was going through the timetable of the confession. And he was arrested at 1040. He was Mirandized at 12. He was Mirandized again at 7. And at 745, he gave a statement. The agent told him, if you do not make a statement and confess, I'm going to keep your wife and your brother. Except the fact finding is against you on that. Well, no. I'm going to point out that he, the agent himself, testified at the trial that even though he didn't he denied having told Mr. Solorio that. The facts were that by the time that he had his case interviewed, he had all the witnesses interviewed at 12 o'clock, that's when he released the wife and the brother. He testified to that at the trial on January 6th at page 160. He testified that that's when he let the wife and the brother go. So I think the Court has to look at the voluntariness as well as the safe harbor on that. Let me see if I can understand what you're saying. You're saying that. It's a combination. Just a minute. That the fact that he, that they weren't, they were not released as soon as they were interviewed. They were not released until after he confessed. Is that what you're saying? Yes. That would corroborate his statement. That's right. That's right. And the agent. So therefore, the judge's finding is clearly erroneous? I believe so. Yes. That's what we would have to find. Well. And he was specifically asked whether he said this? Yes. No, I asked him that. He denied it. He denied it. But he did admit that the sequence of the facts were that he had everyone interviewed by noon, and that's when he let the wife and the brother go. With respect to the government talking about the plea bargaining and whether or not the supervisor submitted declarations that they had never offered a 545, which is importing merchandise into the United States in a case like this, there were other alternatives that we could have done. We could have done a false statement, which would have gotten everybody what they wanted. Mr. Sororio would have gone to jail. He wouldn't have been necessarily automatically deported. The government would have gotten conviction. That was on the record. We counter-offered that. And I believe that there was evidence in the record, too, that he could have pledged to a 545 for failing to declare. What about the proffer? Why do you think we had? Well, the proffer was mainly so that he knew that if he, when he was cooperating with the government in order to get this plea bargaining, that he knew that if he lied, that could be used against him. In terms of whether or not he met his part of the bargain, that's demonstrated by the prosecutor telling the district court, well, we'll give him two levels off for substantial cooperation. We believe that he cooperated. But what about the question, the document that he signed at the time of the proffer? At the time of the proffer? Yes, he signed a document saying that no promises were made and so on. Well, I think that the government's subsequent oral promises to give him the, to give him a plea bargain. That was later? That was later. That was after the plea, after the interviews and the information that he gave the government. And what reliance was there on that alleged oral promise? Well, one thing for sure is that he gave the government all the information that they wanted, that they needed. But that couldn't have been reliance because you're telling us that the promises were later. The promises were later? Yes. Yes. So he couldn't have relied on the promises at the time that he gave the information. It's either one or the other. Either the promises were before the proffer, in which case we have an issue about what about the documents he signed, or the promises were after the proffer, in which case how did he rely on it? Well, I think that the detrimental reliance was I'm going to give you all the information I know. It's the truth. But you just told me that the oral promises were made after that. Right. Right. The oral promises were made after that. But the promise, but there was a promise that there was substantial probability that his case would settle. That's not a promise. Pardon me? I mean, that's not an agreement. Maybe it would help me if you gave me, if you went through all the steps, what happened. First, there was discussions with the earlier prosecutor. Right. Right? Right. And there was an offer that at that point was not accepted. Is that right? I'm arguing that it was accepted as soon as he gave them the information and they, as soon as he gave them the information and they agreed, orally. They agreed orally to what? To let him go ahead and plead to that alternative. When did they do that? What? When did they do, when, when? There were two different prosecutors before she left the office. Right. She told the second prosecutor, yes, that was our bargain. Okay. Was that before or after the proffer? That was after the proffer. Okay. And then the new prosecutor said yes, he would do it. And then they reneged on their offer. And his detrimental, also his detrimental reliance was that at that time he gave them all the information. He reiterated what happened. He did a second proffer? I'm really trying to understand the sequence and I'm having a hard time. Well, he confessed at the border. And then he did the proffer and they interviewed him under the guise of substantial cooperation. And he gave them all the rest of the information that they needed in order to prosecute the case. And the bell had already been rung. There was no way that he couldn't go forward with that. And then with regards to the government stating that there was invited error, the only, the rest of the statement that the material witness gave that Mr. Solorio asked the court to allow him to cross-examine the agent was exculpatory and that was that he did not identify whoever brought him across the border. He could not identify whoever it was. He couldn't state who he talked to about whether or not how much and whether or not he was going to pay for his crossing into the United States. And so I don't see how that's invited error if we're if we're just want to say, OK, this is a whole thing. And part of that is exculpatory. And with respect to Pena Gutierrez, that was, of course, before Crawford. And I don't think that the court should rely on that. I did not hear the last thing you said. Pena Gutierrez that the government relies on was before Crawford. And I think that this Crawford elevates my client's right to compel this witness to a substantial constitutional right. And you can't just rely on a previous case. It's a new rule. And unless the court has any other questions, I'll submit. Thank you very much. Thank you. The case of United States versus Solorio-Gonzalez is submitted and the court will take a penalty assessment.
judges: Canby, Fernandez, Berzon